

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE ARREST OF

**JAMAR TRAYLOR a.k.a. "J-HOP,"
(DOB: 10/08/1981)**

Misc. No.

3:18mj1375 (VAB)

FILED UNDER SEAL

DATE: August 27, 2018

FILED
2018 AUG 27 P 3: 05
US DISTRICT COURT
BRIDGEPORT CT

## AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT AND AN ARREST WARRANT

I, Special Agent Stephen J. Lohmann, of the Federal Bureau of Investigation ("FBI"), being duly sworn, do depose and say:

1.     I am a Special Agent, with the FBI, where I have been employed since 2017. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in violent crime, white collar crime, cybercrime, interviewing, evidence collection, intelligence analysis, and legal matters, among other topics. Prior to becoming a Special Agent, I was employed as a United States Air Force pilot for six years conducting intelligence, surveillance, and reconnaissance missions.

2.     During the course of my career, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking, firearms trafficking, violent criminal activities, and money laundering. My participation in these investigations has included coordinating controlled purchases of narcotics utilizing confidential sources; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; and analyzing telephone toll records. I have participated in investigations into organized criminal enterprise to include violent street gangs and complex narcotics trafficking organizations. Finally, I have participated in

1

investigations involving the use of court-authorized interception of wire and electronic communications.

3.      I am an "investigative or law enforcement officer ... of the United States," within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, task force officers and witnesses. I have personally participated in this investigation and am familiar with the facts and circumstances of the offense described. During the course of this investigation information has been developed through a number of investigative tools, to include court-authorized Title III wire interceptions, controlled purchases of narcotics, physical surveillance, and information provided by confidential informants and cooperating witnesses, as well as analysis of telephone call detail records and telephonic subscriber information. The statements contained in this affidavit are based, in part, on my personal knowledge and from my consultation with other participating investigators and a review of the relevant investigative reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      I make this affidavit in support of the Government's criminal complaint and application for an arrest warrant for JAMAR TRAYLOR (further described below). Based on the facts set forth in this affidavit, there is probable cause to believe that JAMAR TRAYLOR together with others known and unknown, have committed, are committing, and will continue to commit violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846, that is

possession with intent to distribute and distribution of narcotics, to wit heroin and crack cocaine, and conspiracy to do the same.

## THE TARGET SUBJECT

5.      JAMAR TRAYLOR, a.k.a. "J-HOP," is a 35-year-old male, believed to reside at 250 North Bishop Avenue, Apartment 33, Bridgeport, CT. In 2012 and 2013, he was a subject of an earlier FBI investigation (281D-NH-47620), during which law enforcement successfully purchased heroin from him. At that time, he was criminally associated with RONELL HANKS, a federal defendant ultimately convicted and sentenced to 204 months for drug trafficking. During the course of this investigation, JAMAR TRAYLOR has repeatedly sold distribution quantities of heroin, each time utilizing Target Telephone 1, which is his drug phone.

6.      JAMAR TRAYLOR's criminal history includes the following felony convictions:

i.      August 11, 2000: two counts of Sale of Narcotics, for which he was sentenced concurrently to 6 years' jail, execution suspended after 1 year, and 4 years' probation;

ii.     February 11, 2002: Sale of Narcotics, for which he was sentenced to 10 years' jail, execution suspended after 5 years', and 3 years' probation; and

iii.    July 24, 2014: Possession with Intent to Distribute, for which he was sentenced to 10 years' jail, execution suspended after 5 years, and 3 years' probation.

## PROBABLE CAUSE

7.      On August 7, 2017, the Honorable Victor A. Bolden, United States District Judge, entered an Order authorizing the interception of wire and electronic communications occurring over Target Telephone 1. Technical capacity for interception was established on August 8, 2017, and the first interception occurred on that date. Interceptions for that interception period ceased on September 6, 2017. Based on a representative portion of those interceptions, there is probable

cause to believe, and I do believe, that JAMAR TRAYLOR is distributing heroin. There is further probable cause to believe that he is actively supplying resale quantities of heroin and other narcotics, including crack cocaine, to a network of street level dealers in the Bridgeport area.

8.      The call summaries and text messages discussed below are based upon the contemporaneous logs prepared by the monitors on this investigation. The logs indicate the time and date of each interception, and include a synopsis of the communication. The participants in the conversations often refer to themselves and others by street names and use coded references to discuss criminal activity. To the extent that coded words or slang phrases can be interpreted based upon agents' or officers' training and experience, those interpretations are included below. Except in those instances where a transcription is provided or where phrases are placed in quotations, the telephone conversations presented herein are set forth only in substance and in part. The text messages, with limited exception, are set forth verbatim.

9.      At approximately 11:53 a.m., while still in the vicinity of Seaside Park, TRAYLOR placed a telephone call to (203) 296-0401 (session 184) to arrange a meeting with an unknown male. During a follow up telephone call, at 12:08 p.m. (session 186), TRAYLOR and UM0401 had the following exchange:

| | |
|---|---|
| UM0401: | Hello. |
| TRAYLOR: | Yo |
| UM0401: | You going over there? |
| TRAYLOR: | I am going right now. |
| UM0401: | Hey, yo? What's going on over there. There ain't no crazy mess going on over there, right? |
| TRAYLOR: | No. No nothing. There ain't nothing over there. |

UM0401:    I was saying. The boys ain't out there. None of that? You heard?

TRAYLOR:    I am about to pull up.

UM0401:    Alright. I am coming right out. I will be right there. Two seconds.

10.    At 12:10 p.m., TRAYLOR placed a follow up call to UM0401, stating that he was nearly there (session 187). At 12:12 p.m., BSSTF investigators observed TRAYLOR arrive at a Dunkin' Donuts restaurant on Coleman and Washington Streets in Bridgeport, directly across from the public housing project located in Bridgeport's Hollow neighborhood. Shortly thereafter, an unidentified male approached the driver-side window of TRAYLOR's vehicle. The interaction between TRAYLOR and that individual lasted only a few seconds before the UM departed on foot. Based upon my training and experience the abrupt nature of the communication immediately preceding that meeting and the brevity of the interaction is consistent with a drug-related transaction.

11.    Thereafter, at approximately 4:22 p.m., during session 239, TRAYLOR had the following conversation:

TRAYLOR:    [Y]our phone going to voice mail, you not there. I don't know what's going on, yo. I'm on my baby mama's street now ….

UM3787:    You said what?

TRAYLOR:    I'm on my, I'm on my baby mother's street, yo. … I can't sit at that store, Diddy.

                ….

UM3787:    Well, I'm right here. I'm on Grandview, my nigga.

TRAYLOR:    You're on Grandview?

UM3787:    Yeah.

TRAYLOR:   Alright, stay right there.

12.      Surveillance confirmed that at approximately 4:30 p.m., TRAYLOR was driving along Grandview Avenue in Bridgeport in his white Ford Taurus, bearing CT license plate AK13765, when a Nissan Altima approached and stopped next to TRAYLOR's vehicle briefly before driving off.[1] Based on my training and experience, the abrupt nature of the call and the resulting meeting in the middle of a residential street are consistent with a drug exchange. Further, TRAYLOR indicated that he could not "sit at that store," which is likely a reference to the Reservoir Deli. Based upon information obtained during the course of the investigation, there is reasonable cause to believe that North End drug traffickers, like TRAYLOR, would routinely wait for narcotics customers at that location.

13.      At approximately 7:13 p.m., during session 261, TRAYLOR placed an outgoing telephone call to an unknown male at (718) 506-8665. During that conversation, UM8665 stated that he was at the "spot." TRAYLOR stated that he would be stopping by. At approximately 7:30 p.m., TRAYLOR was observed parked near 95 Catherine Street in Bridgeport, where an unidentified male approached him. Based upon my training and experience, the nature of cryptic nature of the communication and the brevity of the meet is consistent with drug trafficking.

14.      At 8:58 p.m., during session 279, JAMAR TRAYLOR had the following telephone conversation with his younger brother, coconspirator ERIC TRAYLOR.

ERIC TRAYLOR:         Yo.

JAMAR TRAYLOR:      Yo.

ERIC TRAYLOR:         Sup yo, um, have time?

---

[1] DMV records confirm that the Nissan was registered to a 70-year-old female resident from Ansonia, Connecticut.

6

| JAMAR TRAYLOR: | Um, what fuckin' time? |
|---|---|
| ERIC TRAYLOR: | Shit, my people, you know they got 250. Well you know, two (unintelligible) … |
| JAMAR TRAYLOR: | I'm saying, when? |
| ERIC TRAYLOR: | When? |
| JAMAR TRAYLOR: | Yeah. |
| ERIC TRAYLOR: | As soon as possible. They coming to meet me in the hood. (Unintelligible). They already up here. |
| JAMAR TRAYLOR: | I'm saying, I'm about to be, I'm a be, I'm be at the steakhouse, I'm about to get something to eat real quick. |
| ERIC TRAYLOR: | Shit, (unintelligible) you here or you gotta go there? |
| JAMAR TRAYLOR: | No, I'm about to go there. |
| ERIC TRAYLOR: | Oh, alright, alright, alright. That's what I'm saying, is it with you? |
| JAMAR TRAYLOR: | Nah, it's not with me. |
| ERIC TRAYLOR: | Oh, oh alright. Let me know when you done with your um, your thing then. |
| JAMAR TRAYLOR: | Alright. |
| ERIC TRAYLOR: | Alright. |

15.     Based upon my training and experience, and from the context of the call, it seems that ERIC TRAYLOR had narcotics customers waiting to purchase $250 worth of drugs. To fill that order, ERIC contacted JAMAR TRAYLOR, asking if he was available to deliver that quantity of narcotics. (As evident from controlled purchases conducted from ERIC TRAYLOR in June and July 2017, described in Special Agent Timothy Simao's August 7, 2017 affidavit, JAMAR TRAYLOR supplies ERIC TRAYLOR with resale quantities of narcotics, including heroin and

crack cocaine.) JAMAR tells ERIC, "it's [the drugs] not with me," meaning that he isn't carrying

the drugs with him. He states that he is on his way to dinner and will call ERIC back later.

16.     Later that evening, at 9:10 p.m., BSSTF investigators were conducting surveillance

on TRAYLOR, who was driving out of the parking area near the Reservoir Deli, a known drug

trafficking location. Based on interceptions monitored during sessions 282 and 284, it appears that

TRAYLOR identified a BSSTF investigator, who was driving a gray Ford F-150 "Super-Duty"

pickup truck bearing a New Jersey license plate. During sessions 282 and 284, TRAYLOR placed

an outgoing call to warn coconspirator Matthew PURDIE, who was apparently in the vicinity of

the deli:

PURDIE:     Yo.

TRAYLOR:   Yo, I'm behind them niggas right now. They got Jersey tags and a
            super duty F-150, bro.

PURDIE:     Super-duty F-150: a red one, right?

TRAYLOR:   Nah, it's a gray one.

PURDIE:     A gray one?

TRAYLOR:   Yeah.

PURDIE:     Alright.

TRAYLOR:   Yo, get up out of there!

PURDIE:     I'm about to. I'm about to.

        iv.     Several minutes later, when the surveillance team withdrew,

TRAYLOR called PURDIE back:

PURDIE:     Yo.

TRAYLOR:   Yo, my nigga, them niggas is on some … a whole other shit up there. I'm talkin', I'm fly up out of here, my nigga!

PURDIE:   Uh, where you last seen 'em at?

TRAYLOR:   (Unintelligible) right when I pulled out, my nigga. I end up behind them directly, I'm telling you about them, and I had them pull out of the parking lot and be behind them. That was the (unintelligible) crazy shit, my nigga. I'm like, oh shit! ….

PURDIE:   It was probably like some Marshals (United States Marshals) or some shit, man. Some Statewide (Narcotics Task Force) shit."

TRAYLOR:   That's some Statewide bullshit.

PURDIE:   That's exactly what that was.

TRAYLOR:   That shit got … New Jersey tags (license plate) on it.

PURDIE:   That newer gray F-150, I probably seen that shit earlier too and not even knowing it.

TRAYLOR:   It's a gray F-150. A new one. Super-Duty one with New Jersey tags, my nigga.

………

TRAYLOR:   You got to stay moving, like. Stay moving (unintelligble). I don't even come up there like that, my nigga.

PURDIE:   … Yeah, I ain't playin', I ain't playin' with these people, man. I'm out of here, man.

TRAYLOR:   We gotta be safe, my nigga, out here …. I'm telling you, my nigga.

PURDIE:   There's too much, too much niggas talkin' up there, man.

TRAYLOR:   Yo, my nigga. Real talk, my nigga. I'm tellin' you …. Yo, the way they stopped and looked at … my car …, was like somebody told them about this car, my nigga.

PURDIE:   Yeah, see, I won't be surprised though.

….

9

PURDIE:     Wow, yo. Yeah, niggas, niggas, niggas is talkin', man. That's why I don't really come through the 'hood like that no more. My ni-, I don't, nah. I go to the shop; I leave the shop; I'm gone. (U/I). Up here, it's too fishy, man.

17.     Based on my training and experience, the interception reflects TRAYLOR and PURDIE's understanding that they are the likely targets of a high-profile criminal investigation involving federal agents ("Marshals") or the "Statewide" narcotics task force; believing that law enforcement's use of a vehicle with out-of-state place is not in keeping with typical Bridgeport Police patrols. That TRAYLOR and PURDIE should be so surveillance conscious, and their belief that they are targets of a statewide or federal narcotics investigation, suggest that they concerned about being arrested for drug trafficking. That inference is further supported when they cite cooperators and informants as a reason to avoid the area ("There's too much, too much niggas talkin' up there, man.") TRAYLOR and PURDIE then continue to discuss recent arrests that allegedly involved informants and cooperators:

PURDIE:     That shit that they say EISHAUN [BELL] did to [TYLER] BALLEW and shit. Like, shit crazy.

TRAYLOR:   What?!

PURDIE:     That shit: they say that EISHAUN got BALLEW wrapped up a couple, couple weeks ago, like last week or some shit. Yeah, they ramped up [searched] BALLEW's spot, found like 79 grams of some diesel [narcotics]. …. Yeah, they found, found like 79 grams of some diesel and shit in BALLEW crib [home], but I guess, I guess he just made a play [had just conducted a drug sale] with EISHAUN … . I don't know man. There's a lot of shit goin' on man, with EISHAUN BELL and COLE [HERNANDEZ] situation.

TRAYLOR:   Get the fuck out of here!

PURDIE:     Yeah, man. They say that shit about Cole. Yeah they sayin' that shit about Cole. Cole got Rico [Federico Cannon] and them

wrapped up. Rico call home [placed a prison call], say he [Cole] did that shit. And EISHAUN. It's like, yo, wow, it's crazy.

TRAYLOR:     Yeah (talking in the background).

PURDIE:      This shit crazy, man.

TRAYLOR:     It is, bro. I ain't hear about none of this shit, bro. That's crazy.

PURDIE:      Yeah, my nigga. Yeah. (cross talk).

PURDIE:      Stay safe, bro.

18.     Based on my training and experience, the conversation above specifically references the recent arrests of TYLER BALLEW and FEDERICO CANNON. I am aware that on July 25, 2017, the Statewide Narcotics Task Force arrested BALLEW in possession of heroin and searched his residence on Maplewood Avenue in Bridgeport. In total, BALLEW was charged with the possession of 70.9 grams of heroin and 65 grams of crack cocaine. I am further aware that on July 31, 2017, Bridgeport police conducted a traffic stop, during which CANNON was found in possession of a firearm. EISHAUN BELL and COLE HERNANDEZ are both known North-End drug dealers.

19.     Beginning at 8:35 a.m. on August 10, 2017, during sessions 352, 353, 356, 358, 362, 364, 367, 372, 373, 433, JAMAR TRAYLOR received a text message from (203) 450-7480, an unknown caller. The two appeared to make plans to meet up "at the crib," a meet location clearly known to both of them, which was likely TRAYLOR's home. In follow up communications, the caller stated that he would be able to meet shortly. TRAYLOR confirmed that he was available and would wait. At 9:34 a.m., the caller confirmed that he was on his way. At 9:44 a.m., TRAYLOR received a voice call from the caller, who had arrived and was waiting downstairs, TRAYLOR then asked him whether he wanted the same as "yesterday," the caller

replied, "yeah, just bring me that." Based upon my training and experience, that conversation was typical of a customer purchasing a quantity of narcotics.

20.     Later, at 5:22 p.m., TRAYLOR received a follow up series of voice calls, again from (203) 450-7480. Those communications led to a second drug-related transaction. The caller stated, "Yo, Hove (one of JAMAR TRAYLOR's street names, as identified by its repeated use by callers interacting with him), did you get rid of that other half yet?" To which, TRAYLOR replied, "Nah, just come through, bro," meaning come over. The caller then placed a call to TRAYLOR at 5:41 p.m., stating that he had arrived. Based upon my training and experience, I believe that that conversation was related to a second narcotics purchase by the same customer.

21.     Beginning at 10:49 a.m. on August 11, 2017, during sessions 541, 546-47, 560-61, 563-64, 567, 568, 569-72, 574, 580, 585-88, 591-93, 598-603, TRAYLOR exchanged a series of text messages and one conversation with the user of telephone number (203) 521-4891, who is believed to be narcotics customer Darlene "Doll" WRIGHT. Based upon my training and experience, WRIGHT and TRAYLOR arranged a transaction for 14 grams of powder cocaine, i.e., approximately one-half ounce, the pertinent parts of that communication are as follows:

| | |
|---|---|
| WRIGHT: | Just need a little something like 14. (560) |
| TRAYLOR: | I'm around just let me kno. You at work still? (561) |
| WRIGHT: | Yeah but my brother is at my house u could go see him … and how much [symbol of a money bag] [?] (563-64). |
| TRAYLOR: | Is $520 ok? (567) |
| WRIGHT: | Ok my address is 64 rosedale st apt CT ring the buzzer and go to the 3 floo[r] my brother got the [money bag symbol]. (568-69). |
| TRAYLOR: | Doing to now. What side is that on doll[?] (580) |
| WRIGHT: | Off park ave. (580) |

TRAYLOR:    Doll this one don't have a bunch of big rocks it's all mixed but it's official. What you want me to do[?] (587).

WRIGHT:     Ok let my brother see it. (592).

TRAYLOR:    Ok ima head over now. (593).

[At 3:21 p.m., during session 603, WRIGHT calls TRAYLOR to direct him to her apartment, where she states her brother is waiting].

22.    Based upon my training and experience, the above text and voice communications relate to the an arrangement between TRAYLOR and WRIGHT to deliver a half-ounce of cocaine for $520 ("is [$]520 ok?"). Based upon my training and experience, that sum is consistent with current street-level pricing for a half-ounce of powder cocaine. Via text message, Wright then directed TRAYLOR to meet her brother on the 3rd floor at 64 Rosedale Street, apt C7, writing: "… my brother got the money." Also during their conversation, TRAYLOR vouched for the quality of the cocaine, stating, "Doll this one don't have a bunch of big rocks it's all mixed but it's official," which I believe means that the cocaine was not finely ground but was nonetheless potent. At approximately 3:15pm, physical surveillance observed TRAYLOR's white Ford Taurus bearing CT license plate AK13765 in the vicinity of Rosedale Avenue. Bridgeport Police surveillance cameras captured an image of CT AK13765 at that location.

23.    At approximately 12:41 p.m., during sessions 559 and 562, JAMAR TRAYLOR received an incoming call from his brother ERIC TRAYLOR. During their conversation, ERIC asked if JAMAR had "hard hats." Based upon my training and experience, I believe that hard hats is a coded term referring to crack cocaine. Interceptions of Target Telephone 2 reveal that ERIC TRAYLOR sold crack cocaine, but did not have inventory as of August 10, 2017. During an intercepted conversation with one of ERIC TRAYLOR's crack customers, he indicated that his

source of supply was travelling to New York for more. This communication accords with ERIC

TRAYLOR's understanding that his brother was freshly stocked with resale quantities of cocaine.

At approximately 12:52 p.m. (session 562), ERIC TRAYLOR called JAMAR to advise him that

he had arrived.

24.     At approximately 3:07 p.m. on August 12, 2017, during session 787, JAMAR

TRAYLOR received an incoming call from his brother, ERIC, utilizing Target Telephone 2. They

discussed meeting up near a store "where you get all the, all the shit from". At approximately 3:12

p.m. (session 788), ERIC TRAYLOR made the following request via text message: "Just bring me

two books, no hard hats." Based upon my training and experience, "books" is a coded term for

heroin, because of its paper packaging. I believe that to be code, likely indicating an order for

heroin (books), rather than cocaine (hard hats). At approximately 3:26 p.m. (session 790), JAMAR

TRAYLOR placed a follow up voice call asking his brother where he was, ERIC responded that

he is waiting at "Yard Jerk," a Jamaican restaurant in Bridgeport. JAMAR then stated that he was

three minutes away. At approximately 3:34pm, physical surveillance observed ERIC TRAYLOR

walk from the vicinity of Yard Jerk, at 1074 Housatonic Avenue, Bridgeport, CT. He was then

observed leaning into the front-passenger side of JAMAR TRAYLOR's white Ford Taurus, which

was parked nearby on North Avenue. ERIC TRAYLOR then appeared to retrieve an unknown

item from within the vehicle, which he placed in his pocket or waistband. Following that brief

transaction, ERIC TRAYLOR walked back toward the restaurant to a green Buick sedan.

25.     At approximately 9:39 a.m. on August 13, 2017, during session 930, JAMAR

TRAYLOR placed an outgoing call to an unknown male utilizing telephone number (203) 928-

8355. The call recipient identified himself as "Mikey". During that conversation, Mikey stated, "I

was calling you 'cause ... I was trying to get something for somebody. I wanted to see if you had it, brother. ...." To which TRAYLOR replied, "... I got everything, Mikey. Just holler at me, my nigga." Based upon my training and experience, that call was a drug-related conversation in which the caller inquired about drugs for sale, TRAYLOR then confirmed that he was stocked with a variety of narcotics.

26.     Beginning at approximately 10:19 a.m., during sessions 934, 936-37, 939, 942, JAMAR TRAYLOR texted his brother at Target Telephone 2, asking, "Yo was the hard hats official[?]" Based upon previous interceptions, I believe that JAMAR TRAYLOR was asking his brother whether customers approved of the quality of the cocaine he obtained on August 10th. As previously indicated, based upon my training and experience, "hard hats" refers to cocaine. In follow-up text messages (sessions 936, 937, 939), JAMAR and ERIC TRAYLOR plan a meet. In session 942, ERIC TRAYLOR clarified that he is "coming ... for two books." Based upon my training and experience, "books" is a coded term for heroin, because of its paper packaging. Based upon ERIC TRAYLOR's distribution activity, I believe two books refers to a quantity of two bundles (i.e., 20 individual doses of heroin).

27.     At approximately 3:45 p.m. on August 14, 2017, during sessions 1159-61, 1166-69 and 1171-72, JAMAR TRAYLOR received an incoming call from his brother, ERIC, via Target Telephone 2. During that conversation, ERIC TRAYLOR asked, "... you ... got some books with you?" JAMAR TRAYLOR replied, "I got one". As with the previous day's communications, the TRAYLOR brothers are using coded communications in furtherance of a likely heroin-related transaction. The two then agree to meet at Famous Pizza, a restaurant on Park Avenue in Bridgeport. During a number of follow up text messages, JAMAR TRAYLOR directed his brother

to the precise meet location.

28.     At approximately 8:14 a.m. on August 15, 2017, during session 1249, JAMAR

TRAYLOR received a text message from telephone number 203-243-9773, believed to be SHANE

NICHOLS, which read "yo hov this shan what up."  They then coordinated to meet up in follow-

up sessions 1251-1255, 1257-58, and 1264. At approximately 9:50 a.m., in session 1278,

NICHOLS called TRAYLOR and asked, "Hey yo, um, where you at, man? Cause I, I gotta … see

you for … two." Based upon my training and experience, NICHOLS was requesting a supply of

two bundles of heroin, to which TRAYLOR replied, "Just come over here, just come over here."

In follow-up text messages, NICHOLS asked if TRAYLOR could deliver instead, because

NICHOLS was without a car. TAYLOR agreed. At approximately 10:00 a.m., during session

1279, NICHOLS asked TRAYLOR's whereabouts, TRAYLOR responded, "I be there in the next

5 minutes. I gotta just grab it." At approximately 10:04 a.m., in session 1281, TRAYLOR received

an incoming text message from NICHOLS, which read "2," confirming that the requested amount

was two bundles of heroin. At approximately 10:05 a.m., in session 1282, NICHOLS called

JAMAR TRAYLOR and said, "I'm not rushing you, but I got the white boy, right? … He, want

… two and I don't want this nigga to leave me man." To which TRAYLOR replied, "Nah, nah, I'm

about to, I'm about to be right there, Shan." Based upon my training and experience, NICHOLS

was concerned that his heroin customer would leave if TRAYLOR delayed. The nature of that

communication indicates that JAMAR TRAYLOR supplies NICHOLS with heroin for resale. At

approximately 10:09am, JAMAR TRAYLOR placed an outgoing call to NICHOLS and told him

that he was pulling up.

29.     At approximately 9:38 a.m. on August 23, 2017, during sessions 2662, 2663, 2669,

2671, 2672, 2674, 2702, 2704, 2705, 2706, TRAYLOR sent the first of 10 text messages with telephone number 203-212-4597, utilized by an unknown male referred to as "Q."

> TRAYLOR:   Got a lot of fire make some move bro. (2663).
>
> "Q":   Got u. (2669).
>
> TRAYLOR:   Tell niggaz whatever you want but 70 for you. (2671).
>
> "Q":   65. (2672).
>
> TRAYLOR:   Nahhhhhhhh. (2674).
>
> "Q":   Way[?] [Where you at]. (2704).
>
> TRAYLOR:   Beef crib playing the game what up[?] (2705).
>
> "Q":   Might have to see u on my way back from work (2706).
>
> TRAYLOR:   let me kno. (2707).

Based upon my training and experience, TRAYLOR was announcing that he had heroin ("fire") for sale, and that the purchase price was $70 per bundle (i.e., 10 individual doses). The statement, "tell niggaz whatever you want," reflects TRAYLOR's understanding that the heroin would be resold, and that "Q" could make a profit. I am aware that $70 is an average wholesale price for a heroin bundle, while the retail street price is approximately $100. "Q" countered with an offer to buy for the heroin at $65 per bundle, which TAYLOR declined.

30.     At approximately 11:08 a.m. on August 24, 2017, during session 2842, JAMAR TRAYLOR received an incoming call from ERIC TRAYLOR.  During their conversation, ERIC asked whether, "[t]hem hats … is around? The new, the new hats?" to which JAMAR replied, "Oh, naw man. I don't know what the fuck happened. That motha fucker was talking about they was there and they wasn't. I was like man, when they get there they get there, I ain't trippin. … I got, this shit flaming right now." JAMAR TRAYLOR may be referring to his conversation he had

with a coconspirator on August 21, 2017, during session 2403.   During that conversation, TRAYLOR asked the coconspirator whether he had any "hats," to which that individual replied that he wouldn't have them until the next day at the earliest. Based on my training and experience, ERIC TRAYLOR's inquiry about "hats" is a coded reference to crack cocaine, which ERIC TRAYLOR has repeatedly used when speaking with his brother. From the conversation it appears that JAMAR TRAYLOR sources resale quantities of crack cocaine from the coconspirator described above and, in turn, supplies ERIC TRAYLOR. In this case, however, JAMAR TRAYLOR's appears unconcerned that he did not have crack cocaine source, given that his heroin sales (often referred to as "fire") were so strong ("this shit flaming right now").

31.    At approximately 1:46 p.m. on August 25, 2017, during sessions 3063, 3065, and 3069-70, TRAYLOR received the first in a series of text message exchanges with telephone number 203-243-9773, believed to be used by SHANE NICHOLS, the first read, "Yo hov …. Just was wondering niggas out at Washington Park got the same shit just was wondering," to which J-HOP replied via text message, "That's me he told me 'bout you this morning. He don't grab much tho everything good tho right?" Based upon my training and experience, those communications stem from NICHOLS's encounter with a competing heroin dealer operating from Washington Park in Bridgeport, who, like NICHOLS, was also selling JAMAR TRAYLOR's particular brand of heroin. NICHOLS's inquiry was aimed at determining whether TRAYLOR was aware that another dealer was selling TRAYLOR's specific brand of heroin. TRAYLOR's reply confirmed that he did in fact sell heroin to that dealer ("That's me …") and that, in turn, that individual had asked TRAYLOR about NICHOLS's use of TRAYLOR's brand (he told me 'bout you this morning). Finally, JAMAR TRAYLOR assured NICHOLS that the dealer in question does not buy in large

quantities ("he don't grab much tho"), implying that NICHOLS should not be worried about competition.

32.     At approximately 1:58pm, during session 3072, JAMAR TRAYLOR received an incoming voice call from NICHOLS, in which the above conversation continued. In pertinent part, NICHOLS stated, "I just aint know, you know? I mean, I ain't know if it was the same, or if niggers was just using your shit. … You know [what] I mean? 'Cause I don't want to see, niggers be using nigger's shit." NICHOLS then stated,"I only got one left, I'm out.  I probably, I probably call you tomorrow or some, or maybe later on today or something." Based upon my training and experience, NICHOLS was telling TRAYLOR that he was down to a single heroin bundle ("I only got one left, I'm out), and that he would need to re-up his supply.

33.     At approximately 5:41 p.m., during session 3095, TRAYLOR sent an outgoing text message to NICHOLS, which read, "Did they like that out there still," to which NICHOLS replied via text message (session 3097), "Yeah the best out there."   Based on previous conversations between TRAYLOR and NICHOLS and the context of this message, it appears that TRAYLOR was asking for feedback on the quality of his narcotics.

34.     At approximately 10:40 a.m., on September 20, 2017, during sessions 7649, 7652, 7657, 7660, 7667, and 7671, TRAYLOR received the first in a series of text message exchanges and telephone calls with ERIC TRAYLOR. During their conversation, ERIC told TRAYLOR, "I'm out here." Shortly thereafter, TRAYLOR called ERIC and stated, "Yo, why you go through that way? Man, don't go over that way, when you like that, period. Cause they acting stupid, you don't have no license, my nigga, they gonna handle you a way you ain't gonna believe. There no tucking, there ain't none of that, they gonna find that." Based upon my training and experience, I

believe TRAYLOR was warning of law enforcement presence and instructing him to avoid a particular route of travel, especially while in the possession of narcotics ("when you like that, period"). Furthermore, I believe the interception reflects TRAYLOR's situational awareness and cunning behavior as a drug dealer as exhibited by his recognition of the risk posed by a vehicle stop while operating a motor vehicle without a license. TRAYLOR implored ERIC to not take those kind of risks, especially while driving with narcotics in the vehicle to avoid attracting any law enforcement attention in fear the discovery of narcotics hidden in the vehicle ("There no tucking, there ain't none of that, they gonna find that").

35.     At approximately 12:18 p.m., on September 28, 2017, during sessions 8997, 9000, 9001, and 9005-9008, TRAYLOR received the first in a series of text message exchanges with ERIC TRAYLOR. During their conversation, ERIC told TRAYLOR, "Yo, they don't like the sauce," to which TRAYLOR responded, "Ok, that was just a test run anyways. Two of the boys love it. Bout to change the press today…I'm about to fix that now." Based upon my training and experience, I believe ERIC was providing TRAYLOR with negative feedback regarding the quality of narcotics ERIC received from TRAYLOR and redistributed to customers ("they don't like the sauce"). TRAYLOR acknowledged the feedback, then told Eric the particular way he [JAMAR] had cut the heroin was new ("…that was just a ten run anways"), and he would adjust his cutting technique ("Bout to change the press today…I'm about to fix that now"). Based off my training and experience, I know drug dealers will often use various cutting agents and fillers to increase the quantity of narcotics they have available to distribute as well as a means of differentiating their particular brand of narcotics from other drug dealers.

36.     At approximately 11:22 a.m., on October 4, 2017, during sessions 10016-10019,

10021, 10023, 10025-10027, 10030, 10094, 10095, 10097, 10098, 10123, 10125, 10128, and 10130, TRAYLOR received the first in a series of text message exchanges and telephone calls from ERIC TRAYLOR. During their conversation, ERIC told TRAYLOR, "I would've been coming through but my people don't like eating there," to which TRAYLOR replied, "Toot you sure this one I have or the last time u mentioned it? Remember I put the regular back out once you said that." ERIC responded, "Yeah the regular one gave me the same result too…That one you gave me after." Based upon my training and experience, ERIC was indicating to TRAYLOR that the narcotics ERIC received from TRAYLOR and redistributed to customers was of poor quality ("my people don't like eating there"). TRAYLOR questioned ERIC's inquiry, and reassured ERIC that he had supplied him and others with narcotics of a quality that is consistent in quality with previous exchanges ("I put the regular back out"). ERIC dismissed this notion, and told TRAYLOR that even the "regular" brand of narcotics that JAMAR mentioned yielded similar negative results.

## REQUEST TO SEAL

In accord with Local Crim. R. 57, the Government respectfully requests that the warrants and application in this matter be sealed until execution of the warrant in order to preserve the integrity of an ongoing investigation, ensure the safety of law enforcement officers, and prevent the flight of investigation targets. Moreover, the Government further requests that the affidavit remain sealed until further order of this Court, as it identifies additional targets of an ongoing federal investigation.

## CONCLUSION

37.     Based upon the information presented above, there exists probable cause exists to believe, and I do believe, that JAMAR TRAYLOR, and others known and unknown, between the dates set forth above, has distributed, and possessed with intent to distribute, heroin and other narcotics, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846. On that basis, the Government respectfully seeks the issuance of federal warrant authorizing the arrest of JAMAR TRAYLOR on the federal charges identified in the accompanying criminal complaint.

Respectfully submitted,

STEPHEN J LOHMANN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me this 2\th day of August 2018, at Bridgeport, Connecticut.

/s/ Victor A. Bolden, USDJ

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE